# IN THE UNITED STATES BANKRUPTCY COURT FOR THE MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| PRECISION CASTINGS OF TENNESSEE, INC., | ) | CASE NO. 305-13160 |
| | ) | |
| | ) | CHAPTER 11 |
| Debtor. | ) | |
| | ) | JUDGE MARIAN F. HARRISON |
| | ) | |
| PRECISION CASTINGS OF TENNESSEE, INC., | ) | ADV. NO. 305-0809A |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| VOLUNTEER AUTOMOTIVE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

_____

## MEMORANDUM OPINION

_____

This matter is before the Court upon the debtor's complaint seeking payment of an account receivable owed to the debtor by Volunteer Automotive[1] for the sale of goods

---

[1] In its pleadings, Volunteer Automotive refers to itself as "Magna Powertrain, Inc. d/b/a Volunteer Automotive."

manufactured by the debtor. Volunteer Automotive asserts that it has a complete setoff defense to the debtor's claims. A trial was held in this matter, and after considering all the proof, the Court took the matter under advisement. For the following reasons, which represent the Court's findings of fact and conclusions of law as required by Fed. R. Bankr. P. 7052, the Court finds that the debtor's complaint should be granted in part.

## I. BACKGROUND

This complaint involves a contract dispute. Beginning in the early part of 2004 and continuing until October 2005, the debtor was to produce certain component parts for Volunteer Automotive that were then incorporated into vehicles. These component parts included pin receivers and stoppers that Volunteer Automotive incorporated into larger assemblies and then shipped to a division of General Motors. Also included were strikers that Volunteer Automotive incorporated into large assemblies and then shipped to Honda. Some of these component parts also required weather coating, which was done by Dekalb Metal Finishing on behalf of Volunteer Automotive. General Motors and Honda both had strict delivery schedules, making timely delivery of the component parts essential to Volunteer Automotive.

The debtor provided quotes on the different component parts to Volunteer Automotive. The quotes stated the debtor's terms and conditions, including unit prices and delivery and production time frames. In response, Volunteer Automotive issued purchase

orders for the production of the component parts. The proof did not conclusively show whether the debtor ever received an actual purchase order (on which Volunteer Automotive's terms and conditions were included). Instead, Volunteer Automotive periodically e-mailed documents entitled "Open Purchase Order by Item" (hereinafter "Open Purchase Orders"). The Open Purchase Orders specified item numbers, part names, purchase order numbers, quantities ordered, and quantities not yet delivered. The Open Purchase Orders also specified requested delivery dates, but as Brad Church, Volunteer Automotive's witness, testified, these requested dates represented a projection of future needs.

According to Volunteer Automotive, from the beginning, the debtor was late in delivering the component parts. Further, many of the component parts that were delivered did not conform to specification and were unusable. In addition, the amounts received were significantly less than the quantities ordered. The debtor presented proof that delays in production were caused by Volunteer Automotive's constant changes to the dimensions, features, and processes of the components. The debtor also presented testimony that because Volunteer Automotive failed to make timely payments, the debtor suffered cash flow deficiencies.

By October 2005, the parties' relationship was strained. The debtor was forced to stop production until the outstanding balances were paid by Volunteer Automotive. Eventually, the debtor stopped production altogether, claiming that Volunteer Automotive

3 - U.S. Bankruptcy Court, M.D. Tenn.

owed it approximately $285,000, according to Ted Bransford, the debtor's witness. Volunteer Automotive indicated that it would not pay for late or unusable component parts.

In early October 2005, Volunteer Automotive notified the debtor that it did not intend to make any further payments for the goods that had been delivered. In response, the debtor sent a demand letter to Volunteer Automotive. At that time, the invoice amount owed for delivered finished goods was $116,487.22, minus $594.00 in rejected items. In addition, the debtor showed $52,987.98 in unfinished goods. Mr. Bransford testified that the debtor has not returned Volunteer Automotive's tooling because these obligations have not been paid.

The parties agree that Volunteer Automotive received goods from the debtor with an invoice value of $116,487.22 and that Volunteer Automotive is entitled to a credit of $594.00 for 54 strikers that were rejected by e-mail received by the debtor on October 25, 2005.

The parties have asked the Court to determine what amounts are owed, if any, by either party. The debtor contends that it is owed $116,487.22 (minus $594.00 in rejected items) for component parts delivered to Volunteer Automotive. The debtor further contends that it is entitled to $52,987.98 for unfinished goods. Volunteer Automotive alleges that it is entitled to setoff any monies owed to the debtor by its consequential damages. The Court agrees with both parties.

## II. DISCUSSION

In resolving this case, the Court looks to Tennessee's version of the Uniform Commercial Code (hereinafter "U.C.C."). Particularly applicable is T.C.A. § 47-2-207, governing "Additional terms in acceptance or confirmation" in the formation of a contract, which provides:

> (1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.
>
> (2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:
>
> > (a) the offer expressly limits acceptance to the terms of the offer;
> >
> > (b) they materially alter it; or
> >
> > (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.
>
> (3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of chapters 1-9 of this title.

In applying this provision, the Court agrees with the Sixth Circuit that this section is a "murky bit of prose," "not too happily drafted," and "one of the most important, subtle, and difficult in the entire Code, and well it may be said that the product as it finally reads is

5 - U.S. Bankruptcy Court, M.D. Tenn.

Case 3:05-ap-00809    Doc 22    Filed 09/29/06    Entered 09/29/06 14:22:54    Desc Main
Document    Page 5 of 13

not altogether satisfactory." *Dorton v. Collins & Aikman Corp.*, 453 F.2d 1161, 1165 (6th Cir. 1972) (quotations omitted); *see also Gen. Steel Corp. v. Collins*, 196 S.W.3d 18, 21 n.3 (Ky. Ct. App. 2006).

T.C.A. § 47-2-207 recognizes that in commercial transactions, the terms of the offer and those of the acceptance will seldom be identical. Instead, a "battle of the forms" occurs since each party typically has a printed form containing terms most favorable to it. *Dorton,* 453 F.2d at 1166. T.C.A. § 47-2-207 acknowledges that in the majority of cases, the "fine print" terms are not meant to make or break the deal. Under T.C.A. § 47-2-207(1), a "definite and seasonable expression of acceptance or a written confirmation . . . operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms." In other words, T.C.A. § 47-2-207(1) deals with situations where there is a definite expression of acceptance that is not conditioned on additional or different terms. *See, e.g., Gage Prods. Co. v. Henkel Corp.*, 393 F.3d 629, 638 (6th Cir. 2004) (parties' initial writings which disagreed on price did not establish a contract).

In the present case, the debtor submitted quotes to Volunteer Automotive, and Mr. Church, on behalf of Volunteer Automotive, testified that the debtor "should have" received the initial purchase order with Volunteer Automotive's terms and conditions. After that, Volunteer Automotive submitted Open Purchase Orders to the debtor with projected

6 - U.S. Bankruptcy Court, M.D. Tenn.

delivery dates. While the parties' conduct indicates that there was a contract (see discussion below), the written documents do not reflect a "seasonable expression of acceptance." The terms and conditions set forth by each party did not agree, and in some instances, were in direct conflict. It appears from the proof that the documents merely passed back and forth between the parties with neither party giving a "definite and seasonable expression of acceptance or a written confirmation." T.C.A. § 47-2-207(1) does not apply to these circumstances because the terms were not only additional or different, they were contradictory. *See United Foods, Inc. v. Hadley-Peoples Mfg. Co.,* No. 02A01-9305-CH-00111, 1994 WL 228773, at *4 (Tenn. Ct. App. May 20, 1994) (different term in an acceptance cannot be proposal for addition to contract where offer already included a contrary term)(citation omitted).

This does not end the Court's inquiry. When no contract is recognized under T.C.A. § 47-2-207(1), the Court must look at the subsequent conduct of the parties, in particular, performance by both parties under what they apparently believed to be a contract, to determine if a contract exists. Pursuant to T.C.A. § 47-2-207(3), such conduct by both parties is sufficient to establish a contract, notwithstanding the fact that no contract would have been recognized on the basis of their writings alone. The U.C.C. Official Comment No. 7 to this section is informative:

> In many cases, as where goods are shipped, accepted and paid for before any dispute arises, there is no question whether a contract has been made. In such cases, where the writings of the parties do not establish a

contract, it is not necessary to determine which act or document constituted the offer and which the acceptance. *See* Section 2-204. The only question is what terms are included in the contract, and subsection (3) furnishes the governing rule.

T.C.A. § 47-2-207(3) instructs that "the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of chapters 1-9 of this title." The contrary terms in the forms exchanged cancel each other out and neither becomes part of the "contract by conduct." *United Foods, Inc.,* No. 02A01-9305-CH-00111, 1994 WL 228773, at *5.

In this case, the extent to which the parties' writings agree supplies only the most basic contract terms. The debtor agreed to timely manufacture and deliver the component parts, and Volunteer Automotive agreed to timely pay for those parts. It is clear from the proof that both parties breached these basic terms. The debtor did not timely manufacture and deliver the component parts even though it knew or should have known that untimely delivery would have significant consequences to Volunteer Automotive, and Volunteer Automotive did not always pay in a timely manner, and in fact, it never paid for some goods that were delivered and accepted. Neither party kept their end of the bargain.

Since there is no apparent agreement as to how damages for the parties' mutual breaches would be determined, the Court must look to the U.C.C. and the proof presented. Both parties offered proof of their damages.

The debtor proved that the invoice for finished and delivered goods was $116,487.22 (minus $594.00 for rejected parts) and that $52,987.98 was owed for goods that were in various stages of completion. While Volunteer Automotive disputes the debtor's right to $52,987.98 for unfinished goods, it concedes, as it must, that the debtor is owed $116,487.22 for finished and delivered goods (minus $594.00 for rejected parts). Volunteer Automotive is seeking to setoff this amount with its incidental and consequential damages caused by the debtor's failure to timely deliver parts. Specifically, Volunteer Automotive showed through Mr. Church's testimony that it had $142,146.59 in expedited freight and weekend line running charges caused by the debtor's delays in delivery.

Under these circumstances, T.C.A. § 47-2-207(3) instructs that damages should be determined by the U.C.C. First, the Court looks at the debtor's damages. There is no dispute that the debtor is entitled to $116,487.22 for finished and delivered goods (minus $594.00 for rejected parts). Instead, the disagreement is whether the debtor is entitled to $52,987.98 for unfinished goods that were in the process of completion when Volunteer Automotive refused to pay. The remedies available to a seller based on the buyer's failure to pay are addressed in T.C.A. § 47-2-703, which provides:

Where the buyer wrongfully rejects or revokes acceptance of goods or fails to make a payment due on or before delivery or repudiates with respect to a part or the whole, then with respect to any goods directly affected and, if the breach is of the whole contract (§ 47-2-612), then also with respect to the whole undelivered balance, the aggrieved seller may:

(a) withhold delivery of such goods;

(b) stop delivery by any bailee as hereafter provided (§ 47-2-705);

(c) proceed under the next section respecting goods still unidentified to the contract;

(d) resell and recover damages as hereafter provided (§ 47-2-706);

(e) recover damages for nonacceptance (§ 47-2-708) or in a proper case the price (§ 47-2-709);

(f) cancel.

T.C.A. § 47-2-704(2) states that "[w]here the goods are unfinished an aggrieved seller may in the exercise of reasonable commercial judgment for the purposes of avoiding loss and of effective realization either complete the manufacture and wholly identify the goods to the contract or cease manufacture and resell for scrap or salvage value or proceed in any other reasonable manner." Here, the debtor stopped production when Volunteer Automotive indicated that it was not going to pay for additional goods. These were custom goods and could not be sold to anyone other than Volunteer Automotive. Thus, it was reasonable for the debtor to simply stop production of these additional parts, and Volunteer Automotive is responsible for the cost of such items based on the percentage of completion. Accordingly,

the debtor established by a reasonable certainty its entitlement to damages in the amount of $52,987.98 for the repudiated goods in addition to the $116,487.22 (minus $594.00 for rejected parts) for delivered but unpaid for goods. *See Pinson & Assocs. Ins. Agency, Inc. v. Kreal*, 800 S.W.2d 486, 488 (Tenn. Ct. App. 1990) (damages for breach of contract must be proved by a reasonable certainty) (citation omitted).

Next, the Court looks at Volunteer Automotive's available damages. Pursuant to T.C.A. § 47-2-717, a buyer may deduct any or all of the damages resulting from any breach of the contract from the amount still due under the same contract. Incidental and consequential damages are defined in T.C.A. § 47-2-715:

> (1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.
>
> (2) Consequential damages resulting from the seller's breach include:
>
>> (a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and
>>
>> (b) injury to person or property proximately resulting from any breach of warranty.

Volunteer Automotive was required to prove its losses with a reasonable certainty. *See Pinson & Assocs. Ins. Agency, Inc.*, 800 S.W.2d 486, 488 (damages for breach of

11 - U.S. Bankruptcy Court, M.D. Tenn.

contract must be proved by a reasonable certainty) (citation omitted). The Court finds that Volunteer Automotive met this burden. Mr. Church testified in detail as to the costs of expedited freight and the charges for running lines on weekends. He further connected these costs to the debtor's failure to deliver parts in a timely manner. Accordingly, the Court finds that Volunteer Automotive is entitled to setoff the amount owed based on $142,146.59 in consequential damages.[2]

---

[2]Mr. Church also testified about additional costs but he was unable to provide amounts. The Court has not considered these because the proof was too speculative.

## III. CONCLUSION

For the foregoing reasons, the Court finds that the debtor is entitled to $168,881.20 ($116,487.22 [finished and delivered goods] - $594.00 [rejected parts] + $52,987.98 [unfinished goods]), and Volunteer Automotive is entitled to setoff in the amount of $142,146.59. The difference of $26,734.61 is owed to the debtor by Volunteer Automotive. Because both parties obviously breached their agreement, and because attorney fees were not an agreed to term under the parties' writings or conduct, the Court will not award attorney fees or other recovery costs to either side.

An appropriate order will enter.

**This Memorandum Opinion was signed and entered electronically as indicated at the top of the first page.**